UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

APR - 2 2010

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

ESTATE OF SOTINA LAVALE CUFFEE,
Deceased, By and Through Her
Administrator, Bradley A. Cuffee,

        Plaintiff,

v.

        Civil Action No. 2:08cv329

JOHN R. NEWHART,
Individually and in His Official Capacity as
Sheriff of the City of Chesapeake,

        Defendant.

---

JOHN R. NEWHART,

        Third-Party Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,

        Third-Party Defendant.

## OPINION AND ORDER

Currently before the court are motions for summary judgment filed by defendant John R.

Newhart, the Sheriff of the City of Chesapeake, Virginia ("Sheriff Newhart"), and by plaintiff.

The motions were fully briefed. After examination of the briefs and the record of this case, the

court has determined that oral argument on the instant motions is unnecessary, as the facts and

legal arguments are adequately presented, and the decisional process would not be aided

significantly by oral argument. For the reasons stated herein, the court **GRANTS** Sheriff

Newhart's motion for summary judgment, **DENIES** plaintiff's motion for summary judgment,

**DENIES** as moot all other pending motions in this case, and **DISMISSES** this case, with prejudice. The court therefore also **DISMISSES** as moot Sheriff Newhart's third-party complaint against Wexford Health Sources, Inc. ("Wexford"), which this court severed by Memorandum Order dated February 16, 2010 for separate proceedings and trial, as necessary.

## FACTUAL BACKGROUND

This case relates to the death of Sotina Lavale Cuffee ("decedent") on July 17, 2006, while she was serving a term of incarceration in the Chesapeake City Jail (the "Jail"). The following material facts do not appear to be in dispute.

The City of Chesapeake (the "City"), on behalf of Sheriff Newhart,[1] entered into a contract with Wexford titled "Inmate Healthcare Services for Chesapeake City Jail," which commenced on July 1, 2005. See Sheriff Newhart's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mot. Mem.") Ex. C. The contract provided that Wexford would operate on-site medical and dental services to meet the immediate medical needs of inmates and to provide necessary medical treatment. Id. at Newhart 0157. Specifically, the contract provided for, *inter alia*, the implementation of a system under which inmates at the Jail could document and file medical concerns on "sick call slips" that would be sorted and triaged by a registered nurse ("RN") or physician within 24 hours or on the next regularly scheduled work day. Id. at Newhart 0171. The contract explicitly required inmates to be seen by an RN or physician within

---

[1] Although Sheriff Newhart is technically not a party to the contract, this court previously indicated in its August 4, 2009 Opinion and Order its agreement with plaintiff's argument that "although the contract is nominally between Wexford and the City, in light of the obligations that the contract imposes on Sheriff Newhart's office, the real party in interest is Sheriff Newhart." Docket No. 65 at 19. As discussed below, this conclusion is also consistent with the fact that the Sheriff, and not the City, is the one statutorily charged by the Code of Virginia with the provision of medical services to inmates.

48 hours of filing a sick call slip, and similarly required immediate dental treatment for acute dental conditions. Id. The contract also required EKG services, including the interpretation of EKG reports, to be provided on-site at the Jail. Id. at Newhart 0172.

From approximately April 11, 2006 until the time of her death, decedent was incarcerated in the Jail, serving an eight-month sentence for welfare fraud. Upon her incarceration, decedent was given an initial screening, during which she disclosed that she was a daily user of cocaine base and was, at the time, "detoxing." Def.'s Mot. Mem. Ex. A at Newhart 0111; see also id. at Newhart 0116. On May 10, 2006, decedent completed a Health Services Request Form, indicating that she was suffering from a bad toothache. Id. at Newhart 0118. Later that day, decedent was seen by licensed practical nurse ("LPN") Monica Thompson. Thompson noted the nature of decedent's complaint and indicated on the form that decedent would be referred to a dentist. Id. It does not appear that any further treatment by a dentist, physician, or RN was scheduled or occurred with respect to decedent's May 10 request. However, it appears that decedent ultimately refused dental care treatment on May 22, 2006, indicating that the problem had been resolved. Id. at Newhart 0117.

On June 17, 2006, decedent completed another Health Services Request Form, indicating that she was again suffering from a painful toothache. Decedent was seen by LPN Courtney Lawson, who apparently examined decedent, noted her reported pain level, and indicated on decedent's form that decedent would be referred to a dentist immediately. Id. at Newhart 0119. Lawson apparently signed the form on June 19, 2006, two days after decedent submitted it. However, as with her previous request, it does not appear that any further treatment by a dentist, physician, or RN was scheduled or occurred with respect to this June 17 request.

On that same day (June 17, 2006), plaintiff completed an additional Health Services

Request Form, indicating that she was suffering from severe chest pains and asking to see a

doctor.[2] Id. at Newhart 0120. Decedent was seen by LPN Sandy Vincent, who assessed decedent

as having chronic indigestion and indicated that decedent would be referred to a medical doctor

for chronic medication. Id. However, despite Vincent's plan, it does not appear that decedent

ever was, in fact, referred to or seen by a medical doctor in connection with her second June 17

request.

On June 25, 2006, decedent submitted yet another Health Services Request Form,

indicating that she was suffering from severe chest pain, especially at night, sweating, tingling in

her arms, shoulders, and back, and insomnia, and requesting immediate care. Id. at Newhart

0121. Decedent was seen by LPN Carmen Crosby, who completed a written assessment

characterizing decedent's complaints as being of a burning sensation in both arms and shortness

of breath, indicating that decedent was complaining of chronic indigestion, and assessing

decedent as suffering from possible indigestion. Id. Crosby did not note on the form the date or

time of her assessment or signature. Id. It does not appear that Crosby referred decedent to a

---

[2] Although decedent dated the form June 17, 2006, the signature of Sandy Vincent, the LPN who assessed decedent in connection with this particular request, is dated July 17, 2006—exactly one month later, on the very date of decedent's death. Vincent appears to have started writing a "6" in the blank for the date, crossed it out, and instead wrote "7-17-06" above the crossed-out "6." The court notes in this connection that Sheriff Newhart's memorandum in support of his motion for summary judgment acknowledges June 17, 2006 as the correct date. See Newhart Mot. Mem at 2. Even if Sheriff Newhart were now to raise an issue in this regard, in the context of the instant motions, as discussed below, the applicable standard of review requires the court to view all facts and reasonable inferences in the light most favorable to the non-moving party.

medical doctor or other more senior health care professional, or took any further action whatsoever, with respect to decedent's June 25, 2006 request.[3]

On the evening of July 16, 2006, decedent's brother (now the administrator of her estate and the plaintiff in this case) visited her at the Jail. Plaintiff's Memorandum in Opposition to Defedant Newhart's Motion for Summary [sic] and in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mot. Mem.") Ex. 12 (Affidavit of Bradley A. Cuffee) ¶ 3. They discussed her symptoms and measures they would take to ensure that she was seen promptly by a physician. Id. ¶¶ 4–6. After their visit, her brother also spoke with one of the corrections officers at the Jail about his concerns over the fact that decedent had not been seen by a doctor. Id. ¶ 7. The corrections officer allegedly told plaintiff that decedent would be put on a list to be seen by a doctor, and that that was the best that could be done. Id. ¶ 8. Decedent also discussed her symptoms with fellow inmates. See, e.g., Pl.'s Mot. Mem. Exs. 15–16.

---

[3] Plaintiff claims, citing Exhibit 13 to his brief, that "it appears that Ms. Cuffee was placed on a doctor's list following her June 25, 2006 complaint." See Pl.'s Mot. Mem. at 19. That exhibit, however, does not appear to contain any reference to decedent. See Pl.'s Mot. Mem. Ex. 13. Plaintiff's Exhibit 10, which is partially illegible, contains an entry for decedent that appears to be dated June 29, 2006, noting her complaints of "chest aches." Pl.'s Mot. Mem. Ex. 10. However, the court notes that, unlike most of plaintiff's other exhibits—which comprise an affidavit from plaintiff, the (unsigned) report of plaintiff's medical expert, various discovery responses, and Bates-stamped documents produced in discovery by Sheriff Newhart or Wexford—Exhibits 10 and 13 bear no Bates stamps. Exhibit 10's illegibility also makes it impossible to determine what it actually is. Even if Exhibit 10 is, in fact, a clinic schedule for the Jail, as Exhibit 13 appears to be, it contains no information as to whether an appointment was ever scheduled for decedent with a medical doctor, or whether any other action was taken, with respect to decedent's June 25, 2006 request, or the reasons for any such actions (or inaction). Indeed, neither document indicates on its face the authorship of the entries on it, the meaning and significance of those entries, or their role in the operation and record-keeping practices of the Jail. Consequently, it is unclear if either is, in fact, a "doctor's list," as plaintiff characterizes it. This point is, in any case, irrelevant to the court's analysis and disposition of the instant motions.

In the early morning hours of July 17, 2006, decedent again asked to see a doctor. See, e.g., Def.'s Mot. Mem. Ex. A at Newhart 0122. LPN Keturrah Lanier advised the corrections staff to escort decedent to the Jail's medical department, where LPN Vincent gave decedent an antacid and instructed her to submit another Health Services Request Form to be evaluated by a medical doctor.[4] Id. Decedent was subsequently returned to her "pod" in the Jail. See, e.g., Pl.'s Mot. Mem. Exs. 15–16 (Inmate Statements). According to decedent's fellow inmates, her insomnia continued through that night, and her condition did not improve over the course of the day. Pl.'s Mot. Mem. Exs. 15–16. Shortly after 6:00 p.m. that evening, decedent's condition worsened to the point that her fellow inmates alerted corrections officers, who subsequently called a medical emergency. Pl.'s Mot. Mem. Ex. 17 (Chesapeake Sheriff's Office Incident Report). When a corrections officer entered decedent's "pod," she advised him she was suffering from chest pains, whereupon the officer called a medical code as decedent lost consciousness and fell to the floor. Pl.'s Mot. Mem. Exs. 1 (Wexford Mortality/Critical Incident Review) & 17; Def.'s Mot. Mem. Ex. A at Newhart 0123. CPR was initiated and 911 was called, and an ambulance arrived at approximately 6:30 p.m., whereupon emergency medical technicians took over attempts to resuscitate decedent. Pl.'s Mot. Mem. Exs. 1 & 17; Def.'s Mot. Mem. Ex. A at Newhart 0123. Decedent was then transported to Chesapeake General Hospital, where she was

---

[4] The circumstances of this encounter on July 17—i.e., that it was LPN Vincent who saw decedent on this occasion, that LPN Vincent assessed decedent as having indigestion, and that LPN Vincent advised decedent to submit a Health Services Request Form for referral to a medical doctor—would be entirely consistent with a finding that decedent's second June 17 request was, in fact, misdated, and actually submitted on July 17. However, as noted above, both Sheriff Newhart and plaintiff refer to the June 17 date, and in the current context the presumption favors the non-movant. The correct date of that particular request is, in any case, immaterial to the court's legal analysis and decision on the instant motions.

pronounced dead. Pl.'s Mot. Mem. Ex. 17. A subsequent autopsy indicated that the cause of her death was coronary artery atherosclerosis. Def.'s Mot. Mem. Ex. A at Newhart 0125–0128 (Report of Autopsy).

## PROCEDURAL HISTORY

Decedent's mother contacted several attorneys about bringing this case shortly after decedent's death. See Docket No. 50-2 (Affidavit of Bevery [sic] C. Cuffee) at 2–3.[5] The first, an unnamed Chesapeake attorney, refused to take the case on a contingency-fee basis. Id. at 2. The second, an unnamed Norfolk law firm, took and "kept the case for over one year before advising [Ms. Cuffee] that because one of the lawyers in the firm had previously represented Sheriff Newhart, the firm had a conflict of interest and could not handle the case." Id. at 3. Finally, decedent's mother found an attorney in Richmond who referred the case to plaintiff's present counsel. Id. As a consequence of these events, plaintiff's present counsel was not asked to take this case until a few months before the statutes of limitations expired, and due to the financial situation of decedent's mother, plaintiff's counsel did not start working on the case immediately. Id.

By letter dated June 13, 2008 (several weeks prior to the filing of this lawsuit), plaintiff's counsel requested that Sheriff Newhart provide, *inter alia*, the identities and positions of all employees or medical care providers with knowledge of or involvement in decedent's medical

_____

[5] The events discussed in this paragraph were not included in the parties' respective statements of undisputed material facts in connection with the instant motions, and in no way impact the court's consideration of the instant motions. However, these facts were provided by affidavit earlier in this case in connection with motions to dismiss plaintiff's First Amended Complaint, and they do not appear to have been disputed by any other party, former or current. The court includes this discussion only for the sake of completeness.

condition and care during her incarceration and prior to her death, presumably so that plaintiff could name them in his initial complaint. See Docket No. 12-2 at 2. By letter dated June 19, 2008, the Office of the Sheriff declined to provide the requested information, citing section 2.2-3706-F-6 of the Code of Virginia, a provision of the Virginia Freedom of Information Act (the "Act") that excludes prison records from the other provisions of the Act, and instead allows the release of such records only at the discretion of their custodian where not otherwise prohibited by law. See Docket No. 12-3.

Plaintiff filed the instant lawsuit on July 16, 2008 (one day before the second anniversary of decedent's death), naming as defendants Sheriff Newhart as well as unknown deputy sheriffs, unknown nurses, unknown physicians and physician's assistants, other unknown health care providers, and other unknown employees of the Jail (collectively, the "Doe defendants"). On August 11, 2008, Sheriff Newhart filed an answer to the complaint and a third-party complaint against Wexford. After further motion practice and limited court-ordered early discovery regarding the identities of the Doe defendants, plaintiff ultimately moved this court on March 12, 2009 for leave to file an amended complaint that, *inter alia*, substituted several individual defendants (including Wexford's Medical and Nursing Directors of the Jail at the time, as well as the various LPNs who assessed decedent) for the Doe defendants and added Wexford as a defendant. The court granted plaintiff's motion and considered the amended complaint filed as of April 3, 2009.

Defendants thereafter filed motions to dismiss the amended complaint. After extensive research and careful consideration, the court dismissed all claims in the amended complaint against the new individual defendants and Wexford by Opinion and Order dated August 4, 2009,

concluding that such claims were barred by the applicable two-year statutes of limitations, could not "relate back" to the date of plaintiff's original complaint pursuant to Rule 15(c)(1) of the Federal Rules of Civil Procedure, and were not otherwise subject to equitable tolling or equitable estoppel. The Opinion and Order also dismissed plaintiff's claims against Sheriff Newhart under 42 U.S.C. § 1983 and for ordinary and gross negligence because plaintiff readily conceded in his partial opposition to Sheriff Newhart's motion to dismiss that the amended complaint failed to set forth facts sufficient to support those claims against Sheriff Newhart. Plaintiff thereafter filed a motion to alter or amend the Opinion and Order, which the court denied by Memorandum Order dated September 11, 2009.

Notwithstanding these decisions by the court, plaintiff filed a motion on October 22, 2009, seeking leave to file a second amended complaint naming Colonel John Gregory, Major Patrick C. Vesci, and John Aten (collectively, the "new defendants") as additional defendants and reinstating the previously dismissed § 1983 and negligence claims against Sheriff Newhart. Sheriff Newhart and Wexford (which, pursuant to the court's orders, had returned to being only a third-party defendant in this case) filed oppositions to plaintiff's motion. By Memorandum Order dated December 11, 2009, the court granted in part and denied in part plaintiff's motion, allowing plaintiff to file a second amended complaint reinstating his § 1983 and negligence claims against Sheriff Newhart, but not naming any new defendants. The court noted therein that plaintiff's earlier concessions regarding his § 1983 and negligence claims had only been made in connection with a partial opposition that sought dismissal of those claims *without* prejudice, and the court's August 4, 2009 Opinion and Order was admittedly silent as to whether its dismissal of

9

those claims was intended to be with or without prejudice. The court reiterated that the statutes of limitations precluded the naming of any additional defendants.

Plaintiff filed his Second Amended Complaint ("Complaint") on December 18, 2009. Both Sheriff Newhart and Wexford filed answers to the Second Amended Complaint. On January 20, 2010, Sheriff Newhart moved the court to dismiss without prejudice or sever his third-party claim against Wexford, arguing that his indemnification claim would not technically become ripe unless and until there were a judgment against him. Sheriff Newhart also complained that the presence of Wexford at trial would allow plaintiff to inject into the case medical malpractice issues relating to the conduct of Wexford personnel that Sheriff Newhart claimed were irrelevant to plaintiff's case against him. On that same day, Sheriff Newhart also filed motions for summary judgment and to exclude plaintiff's medical expert. On January 26, 2010, Wexford responded to Sheriff Newhart's motions, arguing that the court should not sever, but should instead dismiss Sheriff Newhart's third-party claim against it without prejudice, noting that the indemnity issue could be handled in state court should this case result in a judgment against Sheriff Newhart. Wexford also argued in support of Sheriff Newhart's motions to exclude plaintiff's medical expert and for summary judgment. On January 31, 2010, plaintiff filed his oppositions to Sheriff Newhart's motions, as well as his own motions for summary judgment and to exclude Sheriff Newhart's experts, noting that both experts' reports appeared to show that they reviewed documents that Sheriff Newhart refused to produce to plaintiff in

response to plaintiff's discovery requests. The motions for summary judgment, to exclude expert testimony, and to sever or dismiss the third-party claim against Wexford were all fully briefed.[6]

On February 11, 2010, United States Magistrate Judge Douglas E. Miller heard oral argument on the parties' respective motions to exclude expert testimony, and subsequently held the Final Pretrial Conference in this case. As noted above, by Memorandum Order dated February 16, 2010, this court denied Sheriff Newhart's motion to dismiss his third-party complaint against Wexford without prejudice, but granted Sheriff Newhart's motion to sever that third-party claim for separate proceedings and trial in this court, as necessary. On February 17, 2010, Magistrate Judge Miller ordered the parties to participate in a settlement conference on February 24, 2010. By Memorandum Order dated February 19, 2010, Magistrate Judge Miller granted in part and denied in part both parties' motions to exclude expert testimony. Sheriff Newhart filed objections to Magistrate Judge Miller's Memorandum Order on February 23, 2010. As ordered, the parties participated in a settlement conference on February 24, 2010, but were unable to reach a settlement. After careful review of the instant motions and the materials filed in support of them, and in light of the impending trial date of March 2, 2010, this court informed the parties by letter dated February 26, 2010 that it would grant Sheriff Newhart's motion for summary judgment, and that this detailed Opinion and Order, which would constitute the final order in this case, would be prepared as expeditiously as possible.

---

[6] There appear to be three pending discovery motions filed by plaintiff in mid-November 2009 (Docket Nos. 82, 85, and 87) that plaintiff's counsel neither set for hearing before the Magistrate Judge nor withdrew. As noted above, these motions will be denied as moot.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–24 (1986); <u>Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.</u>, 763 F.2d 604, 610 (4th Cir. 1985); Fed. R. Civ. P. 56(c). Although the initial burden obviously falls on the moving party, once the movant has properly filed evidence supporting summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 322–24; <u>Cray Commc'ns, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390, 393–94 (4th Cir. 1994). In other words, while the movant must carry the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue. <u>Celotex</u>, 477 U.S. at 322–23. When considering the non-moving party's submissions, "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party." <u>Smith v. Va. Commonwealth Univ.</u>, 84 F.3d 672, 675 (4th Cir. 1996) <u>(en banc)</u>.

In determining whether the non-moving party has established the existence of a genuine issue of material fact, facts must be deemed "material" if they are necessary to the resolution of the case and "genuine" if they are based on more than speculation or inference. <u>Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995). If, after reviewing the record, it appears that a "reasonable jury could return a verdict for [the non-movant], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Techs.</u>

<u>Applications & Serv. Co.</u>, 80 F.3d 954, 958–59 (4th Cir. 1996); <u>see also</u> <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) ("The inquiry performed is the threshold inquiry of

determining whether there is the need for a trial—whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party.").

## ANALYSIS

**I.     The Effect of the Statutes of Limitations on the Merits of This Case**

The above discussion of this case's procedural history foreshadowed the extent to which

the merits of this case were compromised by the fact that plaintiff was unable to name any

defendants other than Sheriff Newhart prior to the expiration of the applicable statutes of

limitations.  It appears to the court that this case might have consisted of medical malpractice,

negligence, and/or § 1983 claims against the Wexford personnel at the Jail involved in the

decedent's medical care, a breach of contract claim against Wexford (and possibly against Sheriff

Newhart), and § 1983 deliberate indifference and gross negligence claims against Sheriff

Newhart—in other words, substantially the same claims as those advanced in plaintiff's First

Amended Complaint.  However, because plaintiff did not discover the existence of Wexford as

the third-party provider of medical services at the Jail, or the identities of the Wexford personnel

involved in decedent's medical care, until after the applicable statutes of limitations had expired,

this case has instead been reduced to a breach of contract, § 1983, and (gross) negligence case

against Sheriff Newhart, with Sheriff Newhart claiming indemnification under the City's contract

with Wexford as a third-party claim.

## A.  *Apparent Omissions by Wexford and Its Personnel with Respect to Decedent*

The facts of this case appear to show considerable disregard and/or misinterpretation by Wexford personnel of repeated, documented complaints by decedent of symptoms of an impending heart attack. Beyond this potential medical malpractice dimension (which, as noted above, is admittedly no longer a cause of action in and of itself in this case due to the operation of the statute of limitations[7]), it appears that omissions by Wexford medical personnel may also have constituted breaches of Wexford's responsibilities under its contract with Sheriff Newhart. Sheriff Newhart's repeated emphasis of the fact that decedent was always seen by a nurse when she filed a form rings hollow. She was in every case seen by an LPN, not an RN. As noted above, the contract required inmates to be seen by an RN or physician within 48 hours of filing a sick call slip, and similarly required immediate dental treatment for acute dental conditions. Contrary to this explicit language, it appears that decedent was *never once* seen by an RN, a medical doctor, a dentist, or any other more senior health care professional in response to *any* of the forms she filed, despite the repeated nature of her requests and the fact that some of the LPNs who assessed her affirmatively indicated on the sick call forms that decedent *would* be referred to such a professional. It is also worth noting that, as indicated above, the contract required EKG services, including the interpretation of EKG reports, to be provided on-site at the Jail; needless to say, no EKG was ever performed on decedent.

---

[7] Contrary to Sheriff Newhart's arguments in this regard, this does not mean that evidence regarding the acts or omissions of Wexford's medical personnel is irrelevant to plaintiff's claims against Sheriff Newhart. Indeed, these acts or omissions are the very things that Sheriff Newhart's claimed deliberate indifference allegedly permitted to happen. However, as discussed below, such evidence is not by itself sufficient for plaintiff's claims against Sheriff Newhart.

## B.    The Timing of Plaintiff's Case and the Inapplicability of "Relation Back"

As discussed above, plaintiff's counsel were not approached with this case until a few months before the expiration of the statutes of limitations, and did make an effort prior to that expiration date to discover the names of the individuals involved in decedent's medical care and death by sending a letter to Sheriff Newhart's office. However, as the court explained in its December 17, 2008 Opinion and Order, although it does not appear that Sheriff Newhart was statutorily *precluded* from providing that information to plaintiff's counsel at that time, as his response to plaintiff's counsel appeared to suggest, neither was he under any *obligation* to release that information, and whatever his motives might have been for declining the request, it appears that he was fully within his statutory discretion in doing so.

This court believed—and continues to believe—that the tragic and, to say the least, disquieting, nature of the events in this case, as well as the equities involved, clearly favored allowing plaintiff's claims against Wexford and the individual defendants to survive dismissal merely on statute of limitations grounds. However, as noted above, after extensive research the court concluded that, whatever the substantive merits of plaintiff's claims against Wexford and/or the individual defendants might have been, there was simply no way for plaintiff to fulfill the United States Court of Appeals for the Fourth Circuit's exacting requirements for "relation back" pursuant to Rule 15(c)(1) of the Federal Rules of Civil Procedure. See Goodman v. Praxair, Inc., 494 F.3d 458 (4th Cir. 2007). Plaintiff's claims also did not appear to be proper candidates for equitable tolling or equitable estoppel—it does not appear that Wexford or the individual defendants were even aware of plaintiff's lawsuit, let alone that they took any actions to prevent plaintiff from discovering their identities or roles in decedent's medical care until after

15

the statutes of limitations expired. The court simply had no choice but to dismiss plaintiff's claims against them.

The impact of the tragic events discussed above is thus almost entirely blunted by the fact that Wexford and the individual Wexford personnel responsible for decedent's care (or lack thereof) are no longer defendants in this case due to the operation of the statute of limitations. Had they still properly been parties to this case, the court believes that the foregoing evidence would have very likely sufficed to survive any motions for summary judgment with respect to plaintiff's erstwhile claims against them. As discussed below, however, the same cannot be said of plaintiff's claims against Sheriff Newhart.

### C. *Plaintiff's Consequent Focus on Sheriff Newhart*

In the absence of plaintiff's claims against Wexford and its personnel, plaintiff's theory of the case necessarily shifted to Sheriff Newhart's alleged omissions with respect to the contract with Wexford and his constitutional and statutory responsibilities, direct or otherwise, vis-a-vis decedent. Admittedly, the ultimate statutory responsibility for inmate medical care lies with Sheriff Newhart and, as discussed in greater detail below, plaintiff appears to have identified certain omissions by Sheriff Newhart in connection with the City's contract with Wexford. However, there does not appear to be anything in the record of this case showing any causal connection between those apparent omissions by Sheriff Newhart and the alleged omissions by Wexford and/or its personnel that may have led to decedent's death. This critical disconnect will be discussed in greater detail below with respect to each of plaintiff's causes of action against Sheriff Newhart.

16

## II.     Preliminary Matters Relating to Plaintiff's Claims against Sheriff Newhart

### A.     *Sheriff Newhart's Sovereign Immunity in His Official Capacity*

As a preliminary matter, it should be noted that plaintiff's complaints in this case have consistently named Sheriff Newhart both individually and in his official capacity as Sheriff of the City of Chesapeake. In light of the fact that the office of sheriff is created by the Virginia Constitution, rendering Sheriff Newhart a state officer, plaintiff's claims against him in his official capacity are, of course, precluded by the Eleventh Amendment. See, e.g., Francis v. Woody, Civil Action No. 3:09cv235, 2009 WL 1442015, at *4–5 (E.D. Va. May 22, 2009). However, the Eleventh Amendment does not operate to preclude plaintiff's claims against Sheriff Newhart in his individual capacity. Id. at *4–6.

### B.     *Section 53.1-126 of the Code of Virginia*

The Code of Virginia provides in relevant part that although "a sheriff, jail superintendent or a locality" is not required "to pay for the medical treatment of an inmate for any injury, illness, or condition that existed prior to the inmate's commitment to a local or regional facility . . . medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions." Va. Code § 53.1-126. The jurisprudence regarding section 53.1-126 of the Code of Virginia is extremely limited, but uniformly suggests that it may serve as the statutory basis for a lawsuit against the sheriff responsible for a jail and, in some cases, the city or county government responsible for a jail, as well. In Vinnedge v. Gibbs, the Fourth Circuit explained that "[a] willful denial of medical treatment to a prisoner may rise to the level of cruel and unusual punishment, and thus support a claim cognizable under § 1983." 550 F.2d 926, 928 (4th Cir. 1977). In affirming the dismissal of the plaintiff's claims against G. W. Gibbs, then the

17

Superintendent of Jails for the State of Virginia, the Fourth Circuit observed that "[i]t is the Sheriff who is immediately responsible for the prisoner's medical needs under the statute, not Gibbs." Id.

In May v. Newhart, an earlier case filed in the Richmond Division of this court against Sheriff Newhart, United States District Judge Richard L. Williams denied a motion to dismiss by the City of Chesapeake. 822 F. Supp. 1233 (E.D. Va. 1993). In reaching that conclusion, Judge Williams examined the respective roles played by the City and the Sheriff in operating the jail, noting that "[o]nce a county or city elects to operate a local, as opposed to a regional jail, then responsibility for day to day operations of the jail falls to the sheriff." Id. at 1236.

In Roberts v. City of Alexandria, the Virginia Supreme Court held that the City of Alexandria was immune from suit by a nurse employed by an independent contractor hired by the Sheriff to provide medical services at a jail. 431 S.E.2d 275 (Va. 1993). In that decision, rendered just two days after Judge Williams's decision in May v. Newhart, the Virginia Supreme Court also discussed the parallel authority exercised by the City and the Sheriff in operating the jail, noting that "the Sheriff, a constitutional officer, operates the jail and provides medical services to the jail population." Id. at 276 (internal citations omitted). In concluding that the nurse was "engaged in the City's trade, business, or occupation," and therefore considered a statutory employee, against whose claims the City was immune, the court noted that "this conclusion applies equally to employees . . . of independent contractors . . . with whom the Sheriff has contracted to perform the Sheriff's duties in lieu of his own employees." Id. at 277.

Section 53.1-126 of the Code of Virginia was also discussed in relevant *dicta* in Senior United States District Judge Robert E. Payne's opinion in Francis v. Woody. 2009 WL 1442015.

18

In that case, the plaintiff, a former inmate at the Richmond City Jail, alleged claims of deliberate indifference to his serious medical condition against several defendants. Although Judge Payne granted motions to dismiss with respect to several of the plaintiff's claims, he denied the motions to dismiss the plaintiff's claims under the Fifth and Eighth Amendments. In discussing the plaintiff's Fifth Amendment due process claim, Judge Payne noted the plaintiff's reference in his complaint to section 53.1-126, and opined, based on the court's discussion of due process jurisprudence, that "this statutory prescription for medical treatment could also potentially serve as the basis for an actionable due process violation." Id. at *10 n.10.

Sheriff Newhart repeatedly emphasizes the fact that, under Virginia's Minimum Standards for Jails and Lock-ups, issued by the Virginia Department of Corrections, he is prohibited from interfering with the medical decisions of the physician in charge of the Jail's medical department. It is not entirely clear to the court what legislative force these standards have, especially vis-a-vis the Sheriff's clear statutory duties regarding the provision of medical care under section 53.1-126. Moreover, this case does not involve a situation in which it is alleged, for example, that corrections staff prevented the Jail's medical staff from attending to an inmate in need of medical care or attempted to interfere in or influence the provision of medical care. Instead, this case involves alleged failures by (1) the personnel of Wexford, an independent contractor, to provide medical care according to the explicit terms of its contract with the City and (2) Sheriff Newhart to fulfill his duties under the contract to audit and ensure Wexford's compliance with the terms of the contract, in fulfillment of his statutory duty under section 53.1-126. Accordingly, his reliance on the Minimum Standards is not clearly dispositive of plaintiff's claims in this case.

19

**III.    Plaintiff's 42 U.S.C. § 1983 Claim for Deliberate Indifference to Decedent's Serious Medical Condition in Violation of the Eighth Amendment**

The case of <u>Brown v. Mitchell</u> discusses in detail the legal standard that governs plaintiff's § 1983 deliberate indifference claim in this case. In <u>Brown,</u> the administratrix of the estate of a former inmate of the Richmond City Jail alleged that the inmate's death from bacterial meningitis was caused by the jail's overcrowded and unsanitary conditions. The plaintiff sued the City of Richmond, Richmond Sheriff Michelle Mitchell, the jail's Chief Physician, and ten John Doe deputy guards at the jail. Although <u>Brown</u> did not explicitly implicate sheriffs' statutory duty with respect to medical care for inmates under section 53.1-126 of the Virginia Code, the plaintiff's claims in that case—and, more importantly, Judge Payne's lengthy and detailed analysis of them in connection with the defendants' motions to dismiss and subsequent motions for summary judgment—are extremely relevant to this case. See <u>Brown v. Mitchell,</u> 327 F. Supp. 2d 615 (E.D. Va. 2004) (granting in part and denying in part the defendants' motions for summary judgment); <u>Brown v. Mitchell,</u> 308 F. Supp. 2d 682 (E.D. Va. 2004) (granting in part and denying in part the defendants' motions to dismiss the plaintiff's claims).

Although Sheriff Newhart, like a municipality, may be sued in his individual capacity under 42 U.S.C. § 1983, his liability may not be predicated upon theories of *respondeat superior* or vicarious liability. <u>Brown,</u> 327 F. Supp. 2d at 629. Instead, plaintiff must show that Sheriff Newhart had an official policy or custom which caused a deprivation of decedent's constitutional or statutory rights. <u>Id.</u> Judge Payne noted in <u>Brown</u> that "[a]lthough it is perhaps conceptually awkward to argue that the City has an official policy or custom of maintaining the Jail in the alleged state," the Fourth Circuit has recognized that "municipal inaction may, in certain

circumstances, qualify as an official policy or custom for purposes of" the applicable test provided by the United States Supreme Court in <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658 (1978). <u>Brown</u>, 327 F. Supp. 2d at 629 (citing <u>Milligan v. City of Newport News</u>, 743 F.2d 227, 229–31 (4th Cir. 1984)). Specifically:

> [M]unicipal inaction will constitute a custom or policy for purposes of <u>Monell</u>: (1) when the city fails to act despite a known pattern of constitutional deprivations; or (2) when the city fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the city. Municipal liability, however, may not be rested simply upon a failure to adopt policies that, in retrospect, can be seen to be a means by which a particular constitutional or statutory deprivation might have been averted.

<u>Brown</u>, 327 F. Supp. 2d at 629 n.29 (citing <u>Milligan</u>, 743 F.2d at 229–30) (internal citation omitted).

Moreover, the test for deliberate indifference is not an objective one, but instead subjective.

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

<u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

It appears clear that deliberate indifference to the serious medical needs of prisoners violates a clearly established right of prisoners under the Eighth Amendment. <u>See, e.g.</u>, <u>Brown</u>, 327 F. Supp. 2d at 630–31 (quoting <u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 199–200 (1989)).[8] However, as noted in <u>Brown</u>:

> Offering sufficient proof to support a finding of an official policy or custom . . . is not the only hurdle that [a plaintiff] faces in surviving summary judgment . . . . In

---

[8] Accordingly, Sheriff Newhart may not raise qualified immunity as a defense to plaintiff's claims. <u>See, e.g.</u>, <u>Smith v. Smith</u>, 589 F.3d 736, 739–40 (4th Cir. 2009); <u>accord</u> <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); <u>Brown</u>, 327 F. Supp. 2d at 647–51.

21

addition to meeting the policy or custom requirement of Monell, a Section 1983 plaintiff seeking to establish municipal liability also must show a causal nexus between the municipality's custom or policy and the complained of injury. Specifically, at the summary judgment stage, a Section 1983 plaintiff must offer sufficient evidence to support a finding that an "affirmative causal link" exists between the alleged custom or policy and the complained of injury.

327 F. Supp. 2d at 636 (quoting Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999)) (internal citations omitted). Thus, to survive summary judgment, plaintiff must provide evidence that Sheriff Newhart, as the ultimate policymaker for the Jail, had a policy, custom, pattern, or practice of deliberate indifference to the deprivation of medical care to inmates at the Jail, and that this policy, custom, pattern, or practice affirmatively caused or contributed to decedent's death. Brown, 327 F. Supp. 2d at 629–37.

### A.   *Apparent Omissions by Sheriff Newhart*

The theory of plaintiff's § 1983 claim appears to be that Sheriff Newhart's deliberate indifference to Wexford's staffing levels caused or contributed to decedent's death. Plaintiff notes that, at the outset of the renewal term of the contract with Wexford, Sheriff Newhart's office was vigilant in monitoring Wexford's compliance with the contract, including Wexford's staffing levels, and even assessed a substantial monetary penalty against Wexford for failing to fulfill its initial staffing obligations within the time frame specified by the contract. See Pl.'s Mot. Mem. Exs. 5–7 (internal Sheriff's Department memoranda from August 2005 detailing Wexford's non-compliance with the contract's provisions regarding staffing of medical personnel and medical record-keeping) & 8–9 (correspondence regarding penalties against Wexford under the contract). Plaintiff also notes provisions of the contract that provide for monitoring and review of Wexford's staffing levels by the Jail's Chief of Corrections. See Def.'s

Mot. Mem. Ex. C at Newhart 0161–0162. Wexford was required to provide a Staffing Matrix to the Chief of Corrections for approval, and staffing level changes required "the mutual agreement of" Wexford and the Chief of Corrections. Id. at Newhart 0162.

Plaintiff contends, however, that Sheriff Newhart's attentiveness to the sufficiency of Wexford's staffing levels at the Jail waned after the initial renewal term. In this connection, plaintiff makes much of an on-site accreditation survey conducted by the National Commission on Correctional Health Care (the "NCCHC"), one of the bodies that accredited the Jail's medical services, in September 2006. See Def.'s Mot. Mem. Ex. K (the NCCHC Revised Accreditation Report on the Health Care Services at Chesapeake Correctional Center). NCCHC personnel surveyed the Jail on September 25–26, 2006, and found the Jail to be in compliance with only 27 of the NCCHC's 33 "essential standards" applicable to the Jail and 32 of the NCCHC's 37 so-called "important standards" applicable to the Jail (i.e., 86%). Id. at Newhart 0435. NCCHC "[a]ccreditation requires compliance with 100% of the applicable Essential standards and at least 85% of the applicable Important standards." Id. Subsequent to the on-site survey, the Jail submitted to the NCCHC documentation of corrective actions taken, bringing it into compliance with 28 of the 33 essential standards and 92% of the important standards. On November 17, 2006, the NCCHC issued its accreditation report on the Jail, placing the Jail's accreditation on probationary status pending further corrective action by the Jail. Id. The Jail thereafter submitted documentation of further corrective action, and on March 16, 2007, the NCCHC issued a revised accreditation report on the Jail, finding that the Jail's further corrective action had brought it into compliance with all applicable essential standards, and granting it continued accreditation.

23

Although the accreditation report does not indicate explicitly the period of time it purported to cover, it appears clear from its contents that it encompassed the period during which decedent was incarcerated in the Jail. See, e.g, id. at Newhart 0439 (discussing decedent's death, as well as a suicide that occurred in October 2005 and two other deaths that occurred in January and August 2006). The initial findings of the accreditation report appear to corroborate many of the shortcomings alleged by plaintiff in this case with regard to decedent's medical care. The report noted that inmates who submitted health requests "are placed on a doctor's visit list that has a backlog of more than 30 days" and that "[t]he dentist has a backlog of more than 14 days." Id. at Newhart 0443.

> Slips are triaged by nurses, but there does not appear to be a sick call process, and the "triage" process appears to be a sorting and scheduling process only. The lists of inmates scheduled to see the doctor, mental health professional or dentist are all significantly backlogged. The surveyors also noted multiple requests for the same complaint.

Id. at Newhart 0445. The initial report indicated that corrective action was required. Id. The Jail indicated in November 2006 that a plan was implemented, and in March 2007 the Jail provided data from the intervening months showing that, under the new plan, approximately 75% "of inmates requesting sick call were seen within 24 hours and more than 99% were seen between 25 and 72 hours later." Id. The NCCHC concluded on that basis that the Jail had been brought into compliance in that connection. Id. Other related NCCHC accreditation standards were also implicated by these issues. See, e.g., id. at Newhart 0446 (initially finding only partial compliance with respect to nursing assessment protocols and continuity of care during incarceration).

Despite the apparent substantive relevance of the NCCHC accreditation report to the events of this case, especially with regard to the alleged acts and omissions of Wexford and its personnel, both the on-site survey and the issuance of the initial and revised accreditation reports occurred after decedent's death. Consequently, they clearly could not be used, by themselves, to show Sheriff Newhart's alleged subjective knowledge of, let alone deliberate indifference to, inmates' access to medical care at or before the time of decedent's incarceration and death.

Plaintiff also highlights a letter from Wexford to Colonel John Gregory at the Jail in late February or early March 2006, indicating that growth in the Jail's inmate population had put "an impossible clinical load on the current staff" and that "the staffing situation is becoming critical," and requesting immediate action to increase medical, psychiatric, dental, and nursing staffing. Pl.'s Mot. Mem. Exs. 18 & 19.[9] Unlike the NCCHC on-site survey and report, this letter antedated decedent's initial incarceration at the Jail by a mere one to two months, and her death by a mere four to five months.

Finally, plaintiff notes that although "the contract required Sheriff Newhart to conduct a comprehensive performance audit of Wexford's medical care of inmates at the jail" during the time decedent was incarcerated there, there is no evidence whatsoever that Sheriff Newhart ever conducted any such audit. Pl.'s Mot. Mem. at 19–20; see also Def.'s Mot. Mem. Ex. C at Newhart 0189. Sheriff Newhart does not appear to contest this assertion.

---

[9] Exhibits 18 and 19 appear to be slightly different versions of the same letter. Since Exhibit 18 is dated February 28, 2006, and Exhibit 19 is dated March 1, 2006, it seems likely that the former is an earlier draft. The quoted language is, in any case, identical in both exhibits.

## B. No Affirmative Causal or Contributory Link Between Apparent Omissions

In Section I of this Opinion and Order, this court noted the tragic nature of this case and the apparent omissions by Wexford's personnel with respect to decedent's medical care. The court has now also discussed apparent omissions by Sheriff Newhart with respect to the contract with Wexford. Although it thus appears that neither Wexford nor Sheriff Newhart entirely lived up to its respective obligations under the contract, the record does not appear to contain any evidence showing any affirmative causal link *between* these two sets of omissions.[10]

As noted above, plaintiff's theory is that Sheriff Newhart was deliberately indifferent to Wexford's apparent medical staffing shortages at the Jail. Even to the extent that theory is supported by the evidence discussed above, there is simply *no evidence* in the record currently before the court to show that the apparent omissions of Wexford and/or its personnel that allegedly led to decedent's death—*i.e.*, the failure to recognize the symptoms of which decedent repeatedly complained as those of an impending heart attack, the failure to perform an EKG or other assessments or testing on decedent, and the failure to refer decedent to be seen by a medical doctor or other more senior health care professional—*were caused by staffing shortages at the Jail*. Thus, there is no evidence that Sheriff Newhart's deliberate indifference to such staffing shortages, even if *proven*, proximately caused or contributed to decedent's death.

This issue was raised at least partially in connection with the parties' respective motions to exclude each other's expert witnesses. Plaintiff's medical expert, David Walthall Richardson,

---

[10] This fact, in particular, justifies this court's divergence from <u>Brown</u>'s ultimate denial of summary judgment against certain of the plaintiff's claims in that case. In <u>Brown</u>, Sheriff Mitchell had "admitted a causal connection between the overcrowded conditions" of the Richmond City Jail and the plaintiff's death. <u>See</u> 327 F. Supp. 2d at 646 n.57. In this case, Sheriff Newhart has consistently denied plaintiff's allegations.

M.D., prepared an expert opinion in connection with this case, which plaintiff filed as an exhibit in support of his motion for summary judgment. See Pl.'s Mot. Mem. Ex. 23. Therein, Dr. Richardson reviewed the events of the case, discussed the applicable medical/nursing standard of care, and offered his opinions as to whether (1) the various LPNs who assessed decedent failed to meet that standard of care and (2) such failures proximately caused or contributed to decedent's death. Id. at 2–5. Dr. Richardson also reiterated the initial findings of the NCCHC accreditation report, finding on that basis "to a reasonable degree of medical certainty . . . that Doctor Iglecia and Wexford failed to meet the standard of care." Id. at 6–7. However, Magistrate Judge Miller, in granting in part and denying in part Sheriff Newhart's motion to exclude Dr. Richardson's expert testimony at trial, relevantly explained:

> Although Sheriff Newhart correctly argues that this case no longer includes a medical malpractice claim against him, that fact alone does not render Dr. Richardson's testimony irrelevant in its entirety. Certainly expert testimony as to whether specific acts or omissions by the Wexford . . . LPNs . . . involved in decedent's care violated the applicable medical standard of care would be irrelevant to plaintiff's remaining claims against Sheriff Newhart . . . . However, as plaintiff has noted, his cause of action for deliberate indifference requires evidence of "an 'affirmative causal link' . . . between the alleged custom or policy and the complained of injury." Accordingly, evidence regarding the circumstances of decedent's death, her prior cocaine use and the staffing problems alleged by plaintiff would all be relevant. Dr. Richardson's report suggests he will offer evidence regarding whether Wexford's apparent failure in decedent's case to follow the contractual requirement that inmates be seen by a[n] . . . RN . . . or physician within 48 hours *was due to insufficient staffing which contributed to decedent's death*. To the extent that Dr. Richardson is able to opine on these matters based on his expert report, such testimony shall be permitted at trial, subject, of course, to cross-examination by Sheriff Newhart.

Docket No. 144 at 4 (emphasis added). Sheriff Newhart's objections to Magistrate Judge Miller's Memorandum Order, however, made plain that Dr. Richardson, in fact, had no evidence to support

such testimony in this specific connection.  In his deposition, Dr. Richardson gave the following testimony:

> Q    Do you have any facts that the reason that the nurse didn't provide [sic] Ms. Cuffee to a doctor or an RN was caused by nursing shortages?
>
> A    No, I don't have any facts of that.  My opinion is that the nurse should have done better, that nurse.
>
> Q    The nurse could have simply said --
>
> A    Get an EKG.
>
> Q    No.  Let me make sure I got the question.  The nurse could have made the decision not to present, say that she is not sick enough for an EKG and not told the doctor.  To the best of your knowledge, you don't know why the nurse did what she did?
>
> A    That's true.
>
> Q    And it has no basis on whether there's a nursing shortage or not?
>
> A    That is true.

Sheriff Newhart's Objections to Magistrate's Memorandum Order Pursuant to Fed. R. Civ. P. 72 Ex. A (Transcript of Feb. 4, 2010 Deposition of David Walthall Richardson, M.D.) at 0045:2–17.

Simply put, there is nothing in the record to suggest that decedent was not correctly assessed or seen by a medical doctor *because* of the apparent staffing shortages of which Sheriff Newhart was allegedly deliberately indifferent.  Consequently, in the absence of any such affirmative causal link, plaintiff's § 1983 claim against Sheriff Newhart must fail.

## IV.    Plaintiff's Negligence Claims

Sheriff Newhart clearly enjoys sovereign and qualified immunity from plaintiff's simple negligence claim.  See, e.g., Brown, 327 F. Supp. 2d at 660 n.82; Brown, 308 F. Supp. 2d at 696

n.16. However, it appears equally clear that such immunity does not protect Sheriff Newhart from claims of gross negligence, which the Virginia Supreme Court has defined as a "degree of negligence which shows such indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety" of another and which "would shock fair minded men, although something less than willful recklessness." Ferguson v. Ferguson, 181 S.E.2d 648, 653 (Va. 1971); see also Brown, 308 F. Supp. 2d at 696 nn.15–16.

Although Sheriff Newhart is not immune from plaintiff's claim for gross negligence, and the standard for that claim might arguably be somewhat easier to meet than the highly stringent standard applicable to plaintiff's § 1983 claim, the claim nevertheless also fails for substantially the same reason as the § 1983 claim: plaintiff has failed to show any proximate causal link in this case between the claimed acts and omissions of Wexford and/or its personnel that allegedly led to decedent's death and any alleged omissions by Sheriff Newhart with respect to the contract with Wexford. As the Virginia Supreme Court has explained:

> The essential elements of a cause of action, whether based on a tortious act or breach of contract, are (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that duty or right, and (3) harm or damage to the plaintiff as a proximate consequence of the violation or breach.

Stone v. Ethan Allen, Inc., 350 S.E.2d 629, 631 (Va. 1986); accord Caudill v. Wise Rambler, Inc., 168 S.E.2d 257, 259 (Va. 1969). As explained above, there is simply nothing in the record to suggest that Sheriff Newhart's alleged deliberate indifference to Wexford's staffing shortages *was the reason why* Wexford's personnel assessed decedent in the manner they did or failed to refer decedent to a medical doctor, a dentist, or any other more senior health care professional. Accordingly, plaintiff's gross negligence claim against Sheriff Newhart must fail.

29

## V.    Plaintiff's Breach of Contract Claim

As with plaintiff's other causes of action, due to the fact that the applicable statutes of limitations precluded plaintiff from bringing timely claims against Wexford and the individual defendants, plaintiff's breach of contract claim can only be predicated on Sheriff Newhart's alleged "fail[ure] to monitor and enforce the terms and conditions set forth in the contract especially when he knew that Wexford was experiencing staffing vacancies." Compl. ¶ 117. Specifically, plaintiff emphasizes that "the contract required Sheriff Newhart to conduct a comprehensive performance audit of Wexford's medical care of inmates at the jail" during the time decedent was incarcerated there, but that there is no evidence that any such audit was ever actually done. Pl.'s Mot. Mem. at 19–20. Plaintiff also lists several provisions of the contract that he claims Sheriff Newhart was responsible for monitoring. See id. at 25–26.

Sheriff Newhart argues that plaintiff's breach of contract claim against him is invalid as a matter of law, because third-party beneficiaries such as decedent may only bring claims against the promisor, not the promisee. On that basis, Sheriff Newhart distinguishes Ogunde v. Prison Health Services, Inc., 645 S.E.2d 520 (Va. 2007), which held that an inmate had standing to sue an independent medical contractor and its employees as the intended beneficiary of a contract similar to the one at issue in this case. In support of his argument, Sheriff Newhart cites this court's decision in Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc., 542 F. Supp. 2d 452 (E.D. Va. 2008). The court's opinion in that case admittedly states that "this court has held consistently that 'only intended beneficiaries of a contract may enforce against the promisor a duty or right under the contract.'" Id. at 459 (citing Maersk Line Ltd. v. Care, 271 F. Supp. 2d 818, 825 (E.D. Va. 2003)). However, it appears that the focus of that aspect of the analysis in those cases was whether the

30

proposed third-party beneficiary was an *intended* beneficiary of the contract at issue, not whether that

beneficiary was enforcing the contract against *the promisor or the promisee*. There appear to be

cases that suggest, in markedly different contexts, that a third-party beneficiary may only recover

against a promisee (here, Sheriff Newhart) if the promisor (here, Wexford) would have a claim

against the promisee—*i.e.*, if, standing in the shoes of the promisor, as opposed to those of the

promisee, the third-party beneficiary would have a claim against the promisee. See, e.g., Presta Oil,

Inc. v. Van Waters & Rogers Corp., 276 F. Supp. 2d 1128, 1133 (D. Kan. 2003). However, this

court has not found any decisions within the Fourth Circuit that directly support that proposition, and

it is, in any case, unclear from the record currently before the court if Wexford would have any such

cause of action against Sheriff Newhart (*e.g.*, for failing to supervise its activities adequately).

This case clearly presents an unusual factual situation. Plaintiff is admittedly a third-party

beneficiary, but also clearly an intended beneficiary, of the contract. Moreover, the City of

Chesapeake did not enter into the contract with Wexford on behalf of Sheriff Newhart to confer

these benefits on decedent gratuitously, or even in fulfillment of any direct contractual obligation to

decedent, but instead in fulfillment of a duty to all inmates (including decedent) that is statutorily

imposed upon Sheriff Newhart by the Code of Virginia. It is thus not entirely clear whether the

analysis in the cases cited by Sheriff Newhart, even if interpreted in the manner he urges, would be

dispositive of plaintiff's breach of contract claim in this case.

In any case, as with plaintiff's other causes of action against Sheriff Newhart, plaintiff has

failed to cite any evidence showing any proximate causation between Sheriff Newhart's alleged

breaches of his obligations under the contract with Wexford and the alleged acts and omissions by

Wexford and/or its personnel relating to decedent's death. Proximate causation is no less an element

in causes of action sounding in contract than it is in those sounding in tort. See, e.g., Stone, 350

S.E.2d at 631; accord Caudill, 168 S.E.2d at 259; see also Wooldridge v. Echelon Serv. Co., 416

S.E.2d 441, 443 (Va. 1992) (discussing, in the context of a wrongful death action, the proximate

cause element of a breach of contract claim).  Although "[p]roximate cause need not be established

with such certainty as to exclude every other possible conclusion," but instead "may be established

by circumstantial evidence, and a jury may draw reasonable inferences and deductions from such

evidence," there must nevertheless be *some* evidence in the record—circumstantial or otherwise—in

order for such inferences not to be "the product of mere conjecture, surmise, or speculation."

Wooldridge, 416 S.E.2d at 443 (internal quotation and citations omitted); accord Atrium Unit

Owners Ass'n v. King, 585 S.E.2d 545, 548–49 (Va. 2003) (extensively quoting Wooldridge).

Plaintiff has failed to show any evidence of proximate cause, and his breach of contract claim, like

all of his other claims against Sheriff Newhart, must also fail.

## CONCLUSION

For the foregoing reasons, Sheriff Newhart's motion for summary judgment is **GRANTED**,

plaintiff's motion for summary judgment is **DENIED**, all other pending motions in this case are

**DENIED** as moot, and this case is hereby **DISMISSED**, with prejudice.  As a consequence of this

disposition, Sheriff Newhart's third-party complaint against Wexford, which this court previously

severed for separate proceedings and trial, as necessary, by Memorandum Order dated February 16,

2010, is rendered moot, and is hereby also **DISMISSED**, with prejudice.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties, including Wexford.

It is so **ORDERED**.

                                         /s/
                                    _____
                                    Jerome B. Friedman
                                    UNITED STATES DISTRICT JUDGE

April 2, 2010
Norfolk, Virginia